Merrimack, }
June 28, 1912. }

## Boston & Maine Railroad *v.* Franklin.

A power-plant owned by a railroad company and used to generate electricity for the operation of its trolley lines and the lighting of various buildings is not a part of the "road," nor real estate used in the "ordinary business" of the corporation, and is taxable in the town where it is situated.

Petition, for the abatement of the tax assessed by the defendant on the plaintiff's power-plant in Franklin for the year 1911. The plant is owned by the Concord & Montreal Railroad and leased to the plaintiff. Transferred without a ruling from the April term, 1912, of the superior court by *Plummer*, J., on an agreed statement of facts.

The property alleged to have been improperly taxed by the defendant includes a plant for the generation of electric energy, a water-power, and flowage rights, and is located at Eastman Falls on the Pemigewasset river. April 1, 1911, the property was being prepared and developed for the generation of electricity to be used for various purposes by the plaintiff, and was approximately ninety-five per cent completed. Since June 1, 1911, the energy generated has been used to run the Concord and Manchester electric railroad and the Boston & Maine Railroad car shops, and to light miscellaneous buildings used in connection with the plaintiff's business. Under average conditions, these uses require two thirds of the maximum capacity of the plant.

The Concord and Manchester electric railroad is made up of the Concord and Manchester extension and the Concord Street Railway. The Concord & Montreal Railroad was authorized by a decree of the supreme court to build an extension and branch to its steam railroad, to be operated by electricity from Concord to Manchester (R. R. Comm'rs' Rep., 1901, *pp.* 205–208), and was empowered by chapter 195, Laws of 1903, to acquire the Concord Street Railway. The state tax commission included the Eastman Falls property in its assessment of railroad property for 1911, as property used in the plaintiff's ordinary business.

*Streeter, Demond & Woodworth (Frank J. Sulloway* orally), for the plaintiff. The statutory provisions in regard to the taxation of real estate of railroads applying to this case are as follows: "The real estate of railroad corporations and companies, not used

in their ordinary business, and the real estate of telegraph and telephone corporations and companies not included in the provisions of section 3 of chapter 64 of the Public Statutes shall be appraised and taxed by the authorities of the towns in which it is situated." P. S., *c.* 55, *s.* 6, as amended by Laws 1907, *c.* 119. "Railroad, telegraph, and telephone corporations and companies shall be taxed only in the mode prescribed in this chapter except upon real estate not used in their ordinary business; and the taxes assessed by virtue of this chapter shall be in lieu of all taxes upon the stocks issued by such corporations." P. S., *c.* 64, *s.* 12. Under these provisions, only real estate not used in the ordinary business of a railroad is taxable locally by cities and towns.

Upon the agreed facts two questions arise: (1) Is a use of real estate for the purpose of generating electricity for the operation of branches of a railroad and of repair shops and for lighting railroad buildings a use of that property in the ordinary business of the railroad? (2) Is real estate which is being prepared for use in the ordinary business of a railroad in use in the ordinary business of the railroad within the meaning of the statutes referred to above?

1. The Concord & Montreal Railroad was authorized to build or acquire certain electric railroads to be operated as branch lines of its steam railroad. The use of electricity for their operation was ordinary and usual. The question resolves itself into this: Was it part of the ordinary business of the railroad to operate these branch lines, having been duly authorized to build and acquire branch electric railroads and to operate such railroads as branch lines of its steam railroad? This question must be answered in the affirmative. The action of the legislature and of the court in authorizing such business may not necessarily be conclusive, but it is significant. The supreme court, the legislature, and the railroad commission of the state have recognized the operation of these railroads as properly incident to running the Concord & Montreal Railroad, and made the lines so operated branch lines of the railroad.

Such recognition was nothing new or unusual. As early as 1895, the legislature passed a general act authorizing the use of electricity by steam railroads. Laws 1895, *c.* 27, *ss.* 22, 23. Any distinction between electric and steam railroads in the use of electricity was thereby removed. Not only was the use of electricity to operate the main or branch lines of a steam railroad recognized as proper, but the steam railroads were also given the same rights and duties as to the use of the public highways that street railways had. In

view of this, can it now be said, nearly twenty years later, that the use of electricity by a steam railroad to run its branch lines is something extraordinary?  Clearly not.

But irrespective of such express recognition by the state, it is undisputable that street railroads are valuable feeders to steam railroads.  It can no longer be said that a railroad's ordinary business consists solely in running a steam railroad.  It must participate in many enterprises which are not technically railroad business. An example of the diversity of business which is now considered ordinary railroad business is the operation of grain elevators and hotels in connection with a railroad.  *Detroit etc. Co.* v. *Detroit,* 88 Mich. 347; *Chicago etc. Ry.* v. *County,* 48 Wis. 666; *Chicago etc. Ry.* v. *County,* 122 Wis. 273.  The operation of branch lines as feeders comes much more clearly within the definition of ordinary railroad business.  The operation of branch railroads by electricity being ordinary railroad business, it follows that the use of the real estate at Franklin to develop electricity for such operation was a use in the railroad's ordinary business.

It needs no argument to establish that it is part of the railroad's ordinary business to have car and repair shops, stations, freight houses, etc., and that it is a necessary incident of such business to have some kind of motive power and light.  It follows, therefore, that the use of the Eastman Falls property to generate the motive power for the shops, and to light the railroad buildings, was a use in the plaintiff's ordinary business.

2.  It seems clear that the legislature did not intend to make any distinction between property being prepared for actual use and property already in actual use, in the railroad's ordinary business; and that when the words "used in the railroad's ordinary business" were employed in the statute, they were intended to cover property being prepared for use, as well as property in actual use.  Irrespective of that, preparation for actual use is just as much a use in the railroad's ordinary business as is actual use.  It is the railroad's ordinary business to build freight houses, tracks, and whatever is necessary for its ordinary business.  Property in use during such construction work is not only technically, but practically, property used in its ordinary business.  *State* v. *Haight,* 35 N. J. Law 40, 46; *In re N. Y. Bay R. R.,* 75 N. J. Law 111; *Ramsey County* v. *Railway,* 33 Minn. 537, 545.  The Eastman Falls property, which was in process of construction on April 1, 1911, and was completed on June 1, 1911, was property within the operation of the statutes

exempting property used in a railroad's ordinary business from local taxation.

Our contention is that the tax assessed by Franklin on the Eastman Falls property was improper and unwarranted because (1) it was part of the ordinary business of the railroad to operate the Concord & Manchester electric lines, to run its repair shops, and to light buildings in use for railroad purposes; (2) the preparation of the Eastman Falls property for use in this ordinary business, which preparation was completed soon after April 1, 1911, was a use of the property in the railroad's ordinary business within the meaning of the statute; (3) the Eastman Falls property, being in use for the purpose of developing electricity to carry on the railroad's ordinary business, was property exempt from local taxation. If the property was exempt from local taxation, justice requires an abatement, as otherwise the property would be subject to double taxation by the municipality and the state.

*Edward G. Leach* (by brief and orally), for the defendant.

YOUNG, J. If the plaintiff's power-plant is a part of its road, rolling-stock, or equipment, within the meaning of section 1, chapter 64, Public Statutes, the prayer of the petition should be granted (*Fitchburg R. R.* v. *Prescott,* 47 N. H. 62); but if it is not used in the plaintiff's ordinary business, within the meaning of section 6, chapter 55, Public Statutes, the petition should be dismissed (*Nashua & Lowell R. R.* v. *Nashua,* 62 N. H. 602), for the latter section provides that all the real estate of a railroad which is not so used shall be taxed in the town in which it is situated. This section was first enacted in 1844, when it read: "All real estate owned by any railroad corporation, except such as is used for their road and other ordinary and usual purposes of the corporation, and all real estate owned or occupied by such corporation, for their road, for which they have not expended any part of their capital stock, in such a manner as that the several towns through which such roads pass receive one fourth of one per cent, according to the provisions of chapter 39 of the Revised Statutes, shall be appraised and taxed in the several towns where the same may be located, in the same way as is by law provided for appraising and taxing real estate." Laws 1844, *c.* 141, *s.* 1.

If this language is given its ordinary meaning, no land escapes local taxation because owned by a railroad unless it is a part of its "road," and not then unless that part of the corporation's

capital spent to purchase and improve it has been returned in such a way that it increases the amount of the right-of-way tax received by the town in which the land is situated.    It is also clear that under this act no land a railroad owns escapes local taxation unless it is in a town through which its road passes, for no land escapes such taxation unless the town in which it is situated receives a share of the railroad tax (Laws 1844, c. 141, s. 1); and the only towns that receive any part of that tax are those through which the railroad's road passes.   R. S., c. 39, ss. 4, 5.   Such towns, instead of taxing the land within the railroad's right of way, are given one fourth of the tax assessed on the railroad's road, rolling-stock, and equipment.    The share of this tax that comes to a town is to that part of the railroad tax that is divided among the different towns, as the money expended in that town to purchase and improve the railroad's "road" is to the whole of the money the railroad has expended for that purpose in this state.   Laws 1844, c. 141, s. 1; R. S., c. 39, s. 4, 5.   By "road," therefore, as that word is used in these sections, is not intended all the real estate that a railroad uses in its business, nor even all it uses for its "road," but only so much of the land it uses for that purpose as was acquired or improved with capital so expended that the town in which the land lies gets a share of the right-of-way tax in place of a tax on the land.

These sections have been revised and reënacted several times, but there is nothing to show that the legislature intended in these reënactments to make any change in the land belonging to a railroad that is to be exempt from local taxation, or that it intended to include any land in a railroad's "road" that was not included in it when these sections were first enacted.   C. S., c. 41, ss. 4, 5; G. S., c. 49, s. 4; Ib., c. 57, s. 7; G. L., c. 53, s. 5; Ib., c. 62, s. 7; P. S., c. 55, s. 6; Ib., c. 64, s. 13.   The shape this provision took in the revision of 1867 tends to emphasize this conclusion that the only land that is exempt from local taxation because it belongs to a railroad is that which is commonly known as the railroad's "road," or the land it actually uses in the transportation of freight and passengers.   Section 4, chapter 49, General Statutes, provides: "The real estate of railroads, not used for the ordinary and usual purposes in operating the roads, and all real estate so used for which no part of the capital was expended, so that the same may be included in the special assessment provided by law in the case of railroads, shall be appraised and taxed as real estate."

If the language of this section is given any meaning of which it

is fairly capable, the plaintiff's power-plant does not come within its operation. If it is conceded that the plant is land "used for the ordinary and usual purposes in operating" the plaintiff's road, it does not help the plaintiff; for it is not shown that the capital the plaintiff expended to purchase and improve it has been credited to the city of Franklin in such a way as to give that municipality a share of the right-of-way tax of the Concord & Montreal Railroad. The plant, however, is not used in operating the plaintiff's road within the meaning of this section, but to develop the power necessary to operate it. Land so used is no more "used for the ordinary and usual purposes in operating the" road than land which is used to grow timber, or to manufacture rails, bridges, engines, rolling-stock, and other equipment. The fact that the statute enumerates rolling-stock and equipment as things to be assessed by the tax commission (P. S., c. 64, s. 1) makes it clear that land used for any of these purposes is not to be so assessed. It is true that the plaintiff's "road" is one of the things that is to be assessed by the tax commission, and that "road" is sometimes used as synonymous with corporation; but the facts that the statutes speak of the railroad's "road," enumerate the particular items of property to be so assessed, and provide that other real estate belonging to the railroad shall be taxed locally, show that "road" was not used in that sense in this connection. In other words, the context shows that "road" was used in its ordinary sense, or that by it is intended what we think of when we speak of the Boston & Maine Railroad's "road": its right of way, yards, and structures actually used in transporting freight and passengers, and not its shops, power-plants, tenements, etc. The fact that it is the almost universal custom to give the tax on tangible property to the towns in which the property is situated, and to require such towns to provide the necessary protection for the property and those who occupy or have charge of it, tends to the conclusion that "road" is used in its ordinary sense. In other words, the custom of giving the tax on real estate to the town which bears the burden of protecting the property and those who occupy it tends to the conclusion that "road" is used in this connection as synonymous with right of way, yards, and stations. The court would not be justified in finding an intention to abandon that custom from words which, to say the least, do not require such a construction.

If "road," as used in section 1, chapter 64, Public Statutes, is construed to mean the land used for right of way, yards, and sta-

tions, a very little consideration will show that giving one fourth of the tax assessed on a railroad's road, rolling-stock, and equipment to the towns through which the road passes, and the balance to the state and the towns in which its owners live, is consistent with giving the railroad's tax to the municipalities which protect the railroad's property and care for those who occupy it.   Although it costs a very large sum of money to build a railroad, the parts of the road in the different towns through which it passes, in and of themselves, are of little value; for the structures which make the land valuable for the purposes for which it is used often make it nearly valueless for any other purpose.   Fills, cuts, culverts, and rails need little in the way of local protection and receive little or no benefit from money spent for local improvements; for example, new highways that cross a railroad usually increase the value of other property, at the expense of the railroad.   In short, railroads increase the value of all the property in the towns through which they pass and, in so far as their roads are concerned, need but little in the way of local protection, while local improvements depreciate the value of their property.   Since this is so, giving the towns through which a railroad passes one fourth of the taxes assessed on its road, rolling-stock, and equipment is in accord with the custom of giving the municipalities that protect the property the taxes assessed on it, for the state is the taxing district.   There is no more reason, therefore, for giving all the tax assessed on a railroad to the towns through which its road passes than there would be for giving any one of them all the taxes assessed on its rolling-stock and equipment, or on the bonds issued to raise the money to build it.   Any one of these things would be merely an arbitrary exercise of legislative power.   As has already appeared, the state, and not the town, is the taxing district in so far as a railroad is concerned.   Consequently the tax assessed on it should go, in part at least, to the state, or to the different towns in the state in which its owners live.

Although this is true of a railroad's road, it is in no sense true of the plaintiff's power-plant.   That needs the same police and fire protection as other property in Franklin.   The city must educate the children of the men employed to operate it and care for those who are unable to care for themselves.   Improvements which increase the value of other property in that vicinity increase the value of this plant.   The fact that the plaintiff owns it and uses it to develop power to operate a street railway in a distant city does not add anything to its value or to the value of other property in the

city. On the contrary, the fact that the plaintiff transmits the developed energy to Concord decreases the value of all the land in that vicinity, including so much of the land in question as is not needed in the actual operation of the plant. In other words, none of the reasons which make it equitable to tax a railroad's road as a whole and to distribute a part of the tax to the towns in which the owners live obtains in this case, and it does not come fairly within the terms of section 1, chapter 64, Public Statutes, unless by "road" is intended the corporation or all its property. As has already appeared, the context shows that that was not the sense in which "road" was used in this connection; and to give it that construction is to infer, from language equally capable of the opposite construction, that the legislature intended to abandon a policy which has prevailed in this state almost from the time the first settlements were made. To hold that this plant is a part of the plaintiff's road, or that it is land used in the plaintiff's ordinary business, is to hold that the legislature intended to take the taxes assessed on this property from the city which pays for the improvements and protection which constitute a substantial part of its value, and to give them to the state and the towns in which the stockholders of the Concord & Montreal Railroad live, without imposing on those towns the duty of doing anything to protect the plant or the people it brings to Franklin. That is, to hold that the legislature intended this plant should be taxed as a part of the Concord & Montreal Railroad is to hold that it intended to impose upon Franklin the duty of caring for the plant and to give the tax assessed on it to the state and the towns in which the Concord & Montreal Railroad's stockholders live. That that was its intention is, to say the least, very doubtful.

As has already appeared, the land the statute exempts from local taxation is that used in the railroad's ordinary business. If that term is given its usual meaning, the only land that is exempt for that reason is that used in the transportation business; for a railroad is a common carrier, and carrying is a carrier's ordinary or usual business. The land in question is not used in the carrying business, but to develop power to enable the plaintiff to engage in that business. In other words, this land is not used in the plaintiff's ordinary business, except as land used to grow timber for cars and cross-ties is so used. If, therefore, this land is exempt from local taxation for that reason, or if it is exempt because it is customary for railroads to own and operate such plants when that is a convenient or eco-

nomical thing to do, then any land a railroad uses for growing timber is exempt from such taxation; for timber is as essential to the operation of a railroad as power, and the growing of timber is a business in which it is customary for railroads to engage. If this tax had been assessed on a wood-lot, no one would think of the lot as a part of the plaintiff's "road," or as used in its ordinary business within the meaning of section 6, chapter 55, or of section 1, chapter 64, Public Statutes, no matter how the timber might be used.

If this plant is not subject to local taxation, it must be because of chapter 195, Laws of 1903, which authorizes the Concord & Montreal Railroad to own and operate power-plants. Section 1 permits that railroad to "acquire by purchase and develop such property as may be necessary or convenient to produce . . . electrical energy," for the "operation of any portion of its main or branch lines." It will not be necessary to construe this statute; for if it authorizes the plaintiff to engage in business in Franklin, it does not in terms exempt the property the plaintiff acquires under its provisions from local taxation. Since the statute which authorizes the plaintiff to acquire this property does not exempt it from local taxation, it is probable that the legislature intended it should be taxed in Franklin. When the legislature authorizes a corporation to engage in business, it is fair to assume, in the absence of all evidence that that was not its intention, that it intended to give the corporation the same rights and impose on it the same burdens that it gives to and imposes on others engaged in that business. *Mersey Docks* v. *Gibbs*, L. R. 1 H. L. 93, 103. The fact that this act permits the Concord & Montreal Railroad to either purchase such plants or to become a stockholder in them (Laws 1903, c. 195, s. 1) tends to emphasize this conclusion. The plaintiff, however, contends that this presumption does not obtain, because it is necessary for it to use electrical energy to operate its cars; hence the legislature must have intended that such a plant should be considered as a part of the road.

As has already appeared, this reasoning, so far as it rests on the proposition that the plaintiff's road cannot be operated without electricity, applies with equal force to coal and iron mines, oil wells, and land used to grow timber and to manufacture and repair rolling-stock and other equipment; for it is just as impossible to operate a steam road without coal, wood, or oil, as it is to operate the plaintiff's street railway without electrical energy. The same is true as to rolling-stock and equipment. If, therefore, this plant is used for

the usual and ordinary purposes in operating the plaintiff's street railway, or if it is a part of the plaintiff's road because it is impossible to operate its street railway without electrical energy, then any land a railroad uses in its business—whether it is used to grow timber, manufacture cars, repair engines, or as tenements for its employees—is so used; for men are essential to operating the road and they must be housed. In fact, every single thing a railroad uses, from a match to a locomotive, is a thing without which it could not conveniently operate its road. Consequently, if a plant used to develop power is a part of the road because the road cannot be operated without power, then any land used to grow or manufacture any of the things without which the road cannot be operated is a part of the road. If the legislature had intended to exempt all land a railroad uses for any of these purposes, it is probable that it would have used apt words to express its intention. If it had intended to take the taxes assessed on property used as this is from the towns which are compelled to protect it, and to give them to the state and the towns in which the owners live, it would have used words that would not have left its intention in doubt; for it must have known that such a proceeding had not been heard of in this state for more than one hundred years. The legislature, however, instead of enacting that all the real estate a railroad uses in its business shall be exempt from local taxation, provided that all its real estate not used in its ordinary business shall be subject to such taxation; and it could not have thought of land that a railroad uses in a business in which it could not legally engage without special legislation as land used in its ordinary business, or as land "used for the ordinary and usual purposes in operating" the road.

*Case discharged.*

All concurred.